## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RACHELLE MARIE DYAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-3287 |
| | ) | |
| ANDREW SAUL, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Rachelle Marie Dyas appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Dyas filed Plaintiff's Motion for Summary Judgment (d/e 14).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Dyas filed Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion for Summary Judgment (d/e 20). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge

and Reference Order entered June 25, 2020 (d/e 13).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

### Background

Dyas was born on December 23, 1968 and graduated from high school.  She previously worked as a photographer, assistant restaurant manager, office manager, cook, house cleaner, and sandwich maker.  She alleged that she became disabled on June 28, 2016 (Onset Date).  She meets the requirements for insured status through June 30, 2022 (Last Date Insured).  Dyas suffered from the severe impairments of degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, obesity, depression, and poly-substance abuse.  Certified Transcript of Proceedings before the Social Security Administration (d/e 6) (R.), at 16, 24, 39-42, 47, 58-59, 380.

### Evidence Before the Evidentiary Hearing

On August 5, 2015, Dyas saw her primary care physician Dr. Misbah Kalair, M.D., as a new patient.  She reported a history of depression and anxiety.  Plaintiff had been out of her medication Celexa for two-three weeks.  She felt she was stable and described her depression as moderate and also reported chronic back pain with stiffness and decreased range of

motion of her back.  She denied any leg or foot weakness, pain, or numbness and rated her pain as 6/10.  Her symptoms were worsening, but improved with rest, non-steroidal anti-inflammatory (NSAID) pain relievers, and muscle relaxers.  R. 526.

On examination, Dyas was in no acute distress.  She had a normal gait and station as well as normal joints, normal bones, normal muscles and had full range of motion but reported pain with motion.  Straight leg testing was negative.  Her reflexes were 2+ and symmetric with no sensory loss.  She was oriented and had a normal mood and affect.  R. 528.  Dr. Kalair assessed depressive disorder, anxiety, and chronic back pain and renewed her medications.   He noted that a CT scan showed the possibility of a disc bulge.  R. 528-29.

On August 28, 2015, Dyas went to the emergency room.  She had been in a three-car accident 90 minutes before her arrival at the emergency room.  R. 486.  She reported pain in her head, neck, upper and lower back, right shoulder, and right lower leg.  She had a throbbing headache and had pain opening and closing her mouth.  R. 486.  On examination, Dyas was 5 feet 2 inches tall with a weight of 71.8 kg (158.3 pounds) with a body mass index (BMI) of 29.149.  R. 485.  Dyas was in no acute distress and had normal range of motion, normal tone, normal strength, no swelling, and no

deformity.  She was tender to palpation on her right mid tibia with no bruising and had no tenderness in any other extremity and had normal alignment in her back, no step-offs, and pain on palpation in her midthoracic and lower lumbar/sacral areas.  She had a C-collar on her neck during the examination and was cooperative with appropriate mood and affect.  R. 487.  A CT scan of the chest, abdomen, and pelvis showed no acute osseous findings.  R. 491.  A CT scan of the cervical, thoracic, and lumbar spine showed mild degenerative changes throughout.  R. 495. Dyas was discharged to home with instructions to follow up with Dr. Kalair. R. 498.  She was given a prescription for Norco for pain, to be used a needed.  R. 488.

On September 14, 2015, Dyas saw chiropractor Dr. John Warrington, D.C., at the Springfield Accident and Pain Center.  Dyas rated her pain at 10/10 at the time of the visit.  She put her lowest pain level at 8/10 and her average pain level at 9/10.  She had numbness and tingling in her upper extremities and right lower extremity.  The pain was worse with movement and she said that her hands had been numb since her motor vehicle accident.  She reported problems sleeping, standing up from a chair, lifting, changing positions, walking, dressing, bathing, showering, using the toilet. R. 556.  Dr. Warrington opined that Dyas showed pain behavior with

movement and recommended chiropractic treatment three times a week for six to eight weeks.  R. 557.

On March 25, 2016, Dyas saw chiropractor Dr. Warrington.  She reported that she was 75% better overall and her improvement had plateaued.  She felt better sitting, standing, moving, walking, resting, lying down, and performing activities of daily living.  Her radiating pain was also better, but she had intermittent right arm pain that was sometimes sharp. R. 654.  Dr. Warrington observed that Dyas' ambulation and ability to get on and off the examination table had improved.  He stated, "Definite functional objective gains, Patient walks without swaying."  R. 654.  After performing chiropractic treatment, Dr. Warrington directed Dyas to continue the homecare plan and avoid provocative activities.  R. 655.

On June 29, 2016, the day after her Onset Date, Dyas saw Dr. Kalair.  Dyas was in a second car accident on the Onset Date the previous day.  She reported pain and stiffness from the second accident and her back pain was "fairly controlled on current anti-infammatories and muscle relaxers" but the accident "aggravated her pain."  She was "doing fine except for some worsening of her lower back pain and neck pain since yesterday" and had full range of motion in her neck and lower back with a little more discomfort.  She asked for a refill of her Ativan prescription for

her anxiety.  The Ativan used to help her panic attacks, and she has been getting the panic attacks more frequently recently. R. 516.

On examination, Dyas was in no acute distress.  She had normal gait and station and normal bones, joints, and muscles.  Her range of motion in her back was normal but movement was "uncomfortable because of pain." She was oriented and had normal mood and affect.  R. 518.  Dr. Kalair renewed Dyas' prescription for an anti-inflammatory medication naproxen (Naprosyn), a muscle relaxer cyclobenzaprine (Flexeril), and an anti-depressant citalopram (Celexa).  He added a prescription for lorazepam (Ativan) to be used as needed for panic attacks.  R. 518-19.

On July 8, 2016, Dyas returned to the Springfield Accident and Pain Center.  She saw chiropractor Dr. Jared Kennedy, D.C. R. 656-58.  She reported constant severe pain since her second motor vehicle accident. Her level of pain ranged from 8/10 to 10/10 and was 10/10 at the time of the visit.  She had severe and constant numbness and tingling in her upper extremities.  Her symptoms interfered with sleeping, standing up from a chair, lifting, showering, changing positions, dressing, and walking.  R. 656. Dr. Kennedy prescribed three chiropractic treatments a week for four to six weeks.  R. 657.

On July 21, 2016, Dyas went to the emergency room for exacerbation of her low back pain since the June 28, 2016, accident.  She described her pain as sharp and rated the pain as moderate and worse with movement. R. 457-58.  On examination, Dyas was in no acute distress and walked into the examination room.  She had normal range of motion in her spine and normal alignment of her spine.  She had normal sensation and strength in her lower extremities and could walk on her toes and heels.  She had no weakness in her gait and had bilateral paraspinal muscle tenderness and sacroiliac tenderness.  She was able to dress herself and to walk into the emergency room and at discharge.  She otherwise had normal range of motion, normal strength, normal tone, no swelling, and no deformity.  She was oriented with no neurological deficits, and normal sensory and normal motor observed.  R. 459.  She was discharged with prescriptions for Tylenol with Codeine #3 and prednisone.  R. 460.

On August 5, 2016, Dyas saw Dr. Swapna Allamreddy, M.D., in Dr. Kalair's office.  R. 505-08.  Dyas asked for an MRI of her back.  She wanted "to get what is needed so she can have surgery and get off of pain medication."  She reported that her visits to the chiropractor seemed to be helping.  She was on work restrictions until August 8, 2016.  Dr. Allamreddy

told her he would review her records and her CT scans and proceed

accordingly.  Dr. Allamreddy noted,

> Not sure what happened patient got upset and was rude and
> argumentative she did not want to wait, and she demanded
> MRI and said I would order it right now.  She says she wasted
> her time coming here and would have to go to ER again to get
> MRI.  At this point I had to step out and said I will review her ER
> visit and do appropriately.

R. 505.  On examination, Dyas weighed 161 pounds and had a BMI of

29.45.  She was in no acute distress.  Her mood and affect were angry.  Dr.

Allamreddy stated that he did not finish the physical examination "as the

visit did not end up well."  Dr. Allamreddy later reviewed her CT scan

performed at the emergency room.  Upon that review, he ordered an MRI

of her lumbar spine and referred Dyas to an orthopedic specialist.  R. 507.

On August 18, 2016, Dyas had an MRI of her lumbar spine.  The MRI

showed multilevel facet arthropathy most pronounced in the lower lumbar

spine, moderate to severe left neural foraminal stenosis at L5-S1, and mild

left neural foraminal stenosis at L4-5.  R. 541.

On September 16, 2016, Dyas saw Advanced Practice Nurse Carly

Ellison, APN, in Dr. Kalair's office.  R. 508-11.  Dyas stated that she felt like

she had a concussion from the last automobile accident.  She reported

neck pain, headaches, right hip and leg pain, and numbness in her

fingertips and in her lower right leg.  She noticed disrupted speech patterns

and disrupted written communications.  She had an allergic reaction to hydrocodone the last time she went to the emergency room.  R. 509.  On examination, Dyas was 5 feet 5 inches tall, weighed 155 pounds, and had a BMI of 25.79.  R. 510.  She was in no acute distress and no edema in her extremities.  Her cranial nerves were abnormal, and her right pupil was unequal.  Her reflexes were 2+ and symmetric and she had no sensory loss.  She was oriented and had normal mood and affect.  Ellison assessed neuropathy and continued Dyas' current treatment.  R. 511.

On September 21, 2016, Dyas saw Dr. Kalair for back pain.  The back pain had worsened since the June 2016 accident.  She rated her pain at 10 out of 10 and said the pain radiated down both of her legs and reported decreased range of motion in her back due to the pain.  The pain made her anxiety worse and she had not been able to see an orthopedist.  She asked Dr. Kalair to switch her anxiety medication from Ativan to alprazolam (Xanax). R. 512.

On examination, Dyas was in no acute distress, with normal gait and station; normal muscles, bones, and joints; and decreased range of motion in her back due to pain.  Dr. Kalair could not perform specialized testing because Dyas was "having lot of pain."  Her reflexes were 2+ and symmetric, and she had no sensory loss.  She was oriented and had a

normal mood and affect.  R. 514.  Dr. Kalair switched her anxiety medication from Ativan to Xanax.  R. 514.  He offered Dyas tramadol (Ultram) for her pain, but she said that she did not want to be on any pain medications.  R. 515.

On November 3, and November 11, 2016, Dyas went to the Mental Health Centers of Illinois for a comprehensive assessment.  R. 813-23. The diagnosis was major depressive disorder, recurrent, severe.  R. 813. She had been "struggling with depression for about 3 months and it's getting worse."  She denied any homicidal or suicidal ideations.  She sometimes thought about suicide but would never do that.  The assessment showed that Dyas had deficits in communication, problem solving, work and productivity, and coping skills.  R. 814.  A mental status checklist showed that her insight and judgment were appropriate, her memory was intact, her affect and mood were depressed and sad, her psychomotor behavior was unremarkable, her eye contact was appropriate, her gait and posture were steady, her facial expression was sad, and her train of thought was goal-directed and logical.  In addition, she was oriented, she was able to maintain focus during the interview, and she denied having any delusions or hallucinations.  R. 822.  Dyas was referred

to licensed professional clinical counselor Tisha Bayless, L.C.P.C. for individual counseling.  R. 814.

On November 11, 2016, Dyas saw chiropractor Dr. Kennedy for her last treatment reflected in the records provided.  She felt better sitting, standing, walking, resting, and performing activities of daily living.  Her pain radiation was also better but lying down was worse.  Dr. Kennedy observed that Dyas had improved ambulation and improved ability to get on and off the examination table.  He observed, "Definite functional objective gains noted."  R. 938.  "Patient is better overall, but still having daily pain.  She is also having some depression and anxiety specifically about driving.  She is going to start formal Physical Therapy next week."  R. 938.

On November 14, 2016, Dyas completed a Function Report – Adult form (2016 Function Report).  R. 305-12.  She lived in a house with her daughter.  She was in constant pain and had constant headaches.  The pain made her want to stay in bed.  She needed back surgery, but no surgeon would see her.  She felt like giving up and cried most days.  She was "[s]ick, to my stomach at least 30x a day, I feel like I'm going to vomit."  R. 305.

Dyas said that on a typical day, she got up, sometimes showered, sometimes ate breakfast, and looked at her calendar to see if she had any

appointments.  She petted her animals while sitting on the couch and washed dishes.  She called orthopedic surgeons "to see if they'll take me."  She "wince[d] in pain w/ every move I make."  She cried "a lot," watched television, and made phone calls and doctors' appointments.  R. 306.  She performed her personal care although she experienced pain whenever she had to bend.  She used a microwave oven and a crock pot to prepare meals one to two times a week.  She washed dishes, however, she had to stop after five minutes to rest due to her pain.  She experienced pain standing to cook or wash dishes.  R. 306-07.  She did not do any other housework or yardwork.  She drove a car and left her home three times a week to go to appointments with her doctors, chiropractor, and therapist.  She also went grocery shopping with someone else for an hour at a time.  She could pay bills and otherwise manage her finances.  She went out with other people one to two times a week.  She went out to eat, shop at thrift stores, or walked at a shopping mall.   R. 308.

Dyas reported that her impairments limited her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and concentrate.  She had headaches from whiplash. She wrote "15 lbs." next to the word "Lifting" on the Function Report.  She could walk for 15-20 minutes, and she could resume walking after she rested and stretched for

three minutes.  She could pay attention for up to two hours and could follow instructions and generally finished what she started.  She got along well with authority figures.  She did not handle stress well and did not like changes in routine.  R. 310-11.

On December 6, 2016, Dyas saw state agency psychologist Dr. Dolores Trello, Psy.D., for a mental status examination.  R. 791-98.  Dr. Trello had to stop Dyas from talking about "incidents that happened in her life without getting to her own pathology." Her stream of conversation, however, was relevant and coherent.  She was oriented and showed no signs of hallucinations, delusions, psychosis, or thought disorder.  Her memory was intact.  R. 793.  Dr. Trello assessed panic attacks with agoraphobia, generalized anxiety disorder, depressed anxious mood associated with chronic pain and medical conditions, and adjustment disorder with depressed and anxious mood.  Dr. Trello noted that Dyas cried throughout the examination.  R. 795.  Dr. Trello also noted that Dyas had some paranoid thinking.  R. 798.

On December 15, 2016, Dyas saw Advanced Practice Nurse Andrea Peters, APN, CNP, to establish care at the Southern Illinois University Integrated Wellness Clinic (IWC Clinic).  R. 1036.  Dyas reported neck pain that radiated into her shoulders and low back pain that radiated into her

legs.  She had depression and anxiety that was aggravated by her pain and was tearful throughout the visit.  She reported drinking one to two times a week and stated that she drank a fifth to a half gallon of alcohol at a time. She also smoked marijuana at night to help with her pain.  R. 1036.  On examination, she was in no acute distress, and she had normal range of motion and normal muscle strength and tone.  R. 1037.  Peters assessed lumbar pain, depression, and alcohol abuse and continued Dyas' prescription of her muscle relaxant cyclobenzaprine, increased the dosage of her antidepressant Celexa, and referred Dyas for physical therapy evaluation.  R. 1035.

On December 30, 2016, psychologist Dr. M.W. DiFonso, Psy.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 71-72, 75-77.  Dr. DiFonso found that Dyas had affective disorders and anxiety disorders.  He opined that Dyas' mental impairments caused mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. DiFonso found that Dyas had no repeated episodes of decompensation.  R. 72.  He opined that Dyas was moderately limited in her ability to:  understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors.  R. 75-76.  Dr. DiFonso opined that Dyas was capable of performing "multi-step productive activity" with "modified social demand." R. 77.

On January 10, 2017, state agency physician Dr. Calixto Aquino, M.D., prepared a Physical Residual Functional Capacity Assessment of Dyas.  R. 73-75.  Dr. Aquino opined that Dyas could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; never climb ladders, ropes, and scaffolds; and occasionally stoop.  Dr. Aquino opined that she had no other functional limitations due to her medical impairments. R. 74-75.

On January 24, 2017, Dyas saw Dr. Cynthia Thomas, M.D., at the IWC Clinic.  She was out of her anxiety medication Xanax and reported low back pain that radiated into her right leg down to her mid-calf.  She stated that she had a concussion in 2012 and had not had any physical therapy for her back.  R. 1031.  On examination, Dyas was 5 feet 2.5 inches tall, weighed 163.6 pounds, and had a BMI of 29.45.  R. 1033.  She was in no acute distress, had a stooping gait, and was tender in the lumbar and

sacral spine.  Straight leg testing was positive on the left with pain in her back.  Her reflexes were 2+ and symmetric. She had 5/5 strength in her extensor hallucis longus muscle in her shin.  Dr. Thomas started Dyas on clonazepam (Klonopin), once a day, and hydroxyzine (Vistaril), as needed, for her anxiety, and discontinued the Xanax.  He continued her Celexa prescription and referred her to physical therapy for her back.  R. 1031.

On February 22, 2017, Dyas saw Dr. Thomas.  She reported right wrist pain for four to five days.  She noted that she was working at a photography job.  She stated that she was previously diagnosed with carpal tunnel syndrome and had been given wrist splints.  She was tearful during the examination.  R. 1029.  On examination, she was in no acute distress, her gait and station were normal, her right wrist was tender, and she had a positive Finkelstein's test.[1]  She was tender in her lumbar and sacral spine, and her straight leg testing was painful in her back.  R. 1030.  Dr. Thomas said that Dyas could return to work five to 10 hours with no lifting of more than 20 pounds.  She was to continue taking 800 mg of ibuprofen twice a day.  Dr. Thomas continued her anxiety medications but noted that Dyas

[1] Finkelstein's sign is a maneuver with the thumb and wrist that, if positive, indicates De Quervian's disease.  See A. Som; H. Wermuth; P. Singh, "Finkelsten Sign," StatPearls (January 2020) available at https://www.ncbi.nlm.nih.gov/books/NBK539768/ viewed 12/1/2020.  De Quervian's disease is overuse injury with painful tenosynovitis in the wrist and thumb.  See https://www.dorlands.com/dorlands/def.jsp?id=100030720 viewed 12/1/2020.

refilled a prescription for Xanax after Dr. Thomas discontinued that medication and switched Dyas to Klonopin.  Dr. Thomas warned Dyas she would need to sign a controlled medicine agreement and also assessed tenosynovitis of the wrist and prescribed wrist splints.  R. 1028.

In March 2017, Dyas completed another Function Report – Adult form (March 2017 Function Report).[2]  She had constant debilitating pain in her lower back and neck.  The pain radiated into her head and caused nausea 20 to 30 times a day.  The pain caused depression and she cried often.  She woke crying in the night.  R. 257.  She typically started her day with stretches as instructed.  She then made sure her daughter was fed and ready to go to school, took her medicine, watched television, and checked her calendar for appointments.  She showered if she had an appointment.  She went to any appointments.  She also worked 10 hours a week; the work required her to sit and do paperwork.  Otherwise, she watched television, worked puzzles, and did more stretches.  She only slept three to four hours a night because her pain interfered with her sleep.  She dressed herself and took care of her personal hygiene, although performing many of

---

[2] The date of the 2017 Function Report is unclear.  Dyas dated the form as "March," without any day or year.  R. 264.  The accompanying instructions for returning the form was dated February 23, 2017.  R. 266.  The instructions stated that the form should be returned within 20 days.  R. 267.  This information indicates that the form was completed in March 2017.  The Court Transcript Index, however, lists the date of the 2017 Function Report as March 20, 2016.  The Court believes the date on the instructions accompanying the form to be more reliable.  The Court finds that Dyas completed the form in March 2017 for purposes of this Opinion.

these tasks was painful.  R. 258.  She prepared dinner four times a week that consisted of simple meals such as frozen dinners, sandwiches, and pizza.  Dyas washed dishes and folded laundry, but her daughter lifted and carried the laundry.  She only washed a few dishes at a time because standing for long periods was too painful.  R. 259.  She left home four to five times a week alone and shopped once a week for 45 minutes.  Her daughter went with her to shop, and her daughter loaded and unloaded heavy items.  She took care of her bank account and paid her bills.  R. 260-61.  Her hobbies were guitar, crafts, television, computer, card games, and puzzles.  She usually could only sit for short periods to engage in these activities and had to change positions for longer periods.  She talked on the phone three to four times a week for an hour at a time and went out to eat twice a month.  Dyas went to church once a week, grocery stores two to three times a month, physical therapy once a week, and mental therapy once every two weeks.  R. 261.

Dyas said on the 2017 Function Report that impairments affected her ability to sit, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and get along with people.  These activities were affected by "pain, pain, pain no matter what I do or how I do it."  R. 262.  She could walk for an hour before needing to rest for a few minutes.  She could pay

attention for two hours and could follow instructions.  She let stress build up inside until she would "explode all emotional."  She did not like change.  R. 263.

On March 29, 2017, Dyas saw Dr. Thomas.  She felt she was making progress with her mental health counselor.  She took Klonopin once a day and Vistaril twice a day.  The Vistaril did not help with two of her panic attacks.  She finished physical therapy and said she continued to do the exercises.  She worked for a photography company.  Dyas formerly went to schools and took school pictures but now could not due to her back pain.  Her wrist also still hurt and she was wearing a wrist splint.  Her boyfriend said she snored and had some apnea.  R. 1026.  On examination, her L-S spine was tender, paraspinal muscles were not tender, straight leg raising test was negative, neck flexion was limited and painful, lateral bending of neck was painful, reflexes were 2+ and symmetric, and her mood and affect were tearful.  R. 1027.  She rated her back pain at 6/10.  Dr. Thomas prescribed gabapentin for pain and encouraged Dyas to do the physical therapy exercises.  Dr. Thomas referred her for a nerve conduction study for her wrist pain and wanted to taper her use of Klonopin.  She agreed to sign a controlled substance agreement and to submit a sample for a urine tox screen.  Dr. Thomas discussed switching her antidepressant

medication to venlafaxine (Effexor) and also ordered a sleep study, pending financial authorization.  R. 1025.

On April 22, 2017, state agency psychologist Dr. Donna Hudspeth, Psy.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment of Dyas. R. 117-18, 121-24.  Dr. Hudspeth found that Dyas had affective disorders and anxiety disorders. She opined that Dyas' mental impairments caused mild limitations in her ability to understand and remember information and to adapt or manage oneself; and moderate limitations in her ability to interact with others and concentrate, persist, or maintain pace.  R. 117.  Dr. Hudspeth opined that Dyas was moderately limited in her ability to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriate with the general public; accept instructions; and respond appropriately to criticism from supervisors.  R. 122-23.  Dr. Hudspeth concluded that Dyas was capable of "multi-step productive activity" with "modified social demand."  R. 123.

On April 24, 2017, state agency physician Dr. Victoria Dow, M.D., prepared a Physical Residual Functional Capacity Assessment of Dyas.  R. 103-05.  Dr. Dow opined that Dyas could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour

workday; sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and occasionally stoop.  Dr. Dow opined that Dyas had no other functional limitations due to her medical impairments. R. 74-75.

On May 2, 2017, Dyas saw Advanced Practice Nurse Peters.  Dyas was taking gabapentin, cyclobenzaprine, and ibuprofen for her back pain. She used less ibuprofen due to stomach problems and her pain was not well controlled.  Her back pain radiated down her legs with numbness and tingling.  She did not notice any improvement from her physical therapy and her depression worsened due to the pain.  Dyas' tox screen came back positive for marijuana.  She said the marijuana helped with her pain and anxiety and she wanted to discontinue the Klonopin because it was not helping.  R. 1022.  Peters did not record any notes of any examination of Dyas at this visit.  Peters stopped Dyas' Klonopin prescription, started her on venlafaxine, and increased the dosage of the gabapentin.  R. 1023-24.

On June 7, 2017, Dyas saw Dr. Thomas.  She reported continued neck and back pain and said her current antidepressant and depression medication was "starting to help somewhat," but she was out of venlafaxine due to insurance problems.  R. 1017.  On examination, she was in no acute distress, she was tender in her L-S spine and base of her cervical spine,

and she had pain on flexion of the spine.  Straight leg raising test was negative and her grip was symmetric.  Spurling's maneuver was positive when rotating her head to the right.[3]  Her mood and affect were tearful.  An x-ray of her cervical spine showed disc space narrowing osteophytosis at C5-6 similar to her August 28, 2015 CT scan, and soft tissue contours within normal limits.  The radiologist assessed that her cervical spine degenerative changes were stable.  R. 1019.  Dr. Thomas increased her gabapentin dosage, continued her other medications, and told her to keep her appointment with her mental health therapist.  R. 1020.

On September 6, 2017, Dyas saw Dr. Thomas.  Her hands and feet were going numb.  She went off gabapentin due to her insurance limiting her to four prescriptions.  Dyas did not notice a difference without the gabapentin.  She also could not fill her Effexor prescription because of her insurance and was using ibuprofen two to three times a day for pain and Vistaril one to three times a day for anxiety.  R. 1014.  On examination, Dyas was in no acute distress.  She was tender in her lower cervical spine and L-S spine.  Straight leg raising test was negative.  Her reflexes were 2+.  R. 1016.  She reported neck pain that radiated into her head causing

---

[3] Spurling's maneuver involves pressing on the top of the head while the patient rotates the head laterally. Pain radiating into the upper extremities indicates radiculopathy.  See https://www.dorlands.com/dorlands/def.jsp?id=100106510 viewed 12/1/2020.

headaches and also had low back pain that radiated down her legs.  R.

1011.  On examination, Dyas was in no acute distress.  She had

tenderness with spasm in her trapezius muscles.  Dr. Thomas administered

an injection of the NSAID ketorolac tromethamine (Toradol) for Dyas' pain

in her lumbar spine, switched her from ibuprofen to naproxen, and referred

her for osteopathic manipulation therapy.  R. 1012.

On December 6, 2017, licensed clinical professional counselor

Bayless prepared a comprehensive assessment of Dyas.  Bayless listed

Dyas' diagnosis as major depressive disorder, recurrent, severe.  R. 1047.

She had deficits in communication, problem solving, work and productivity,

and coping skills.  Her reported symptoms included crying spells,

depressed mood, sleep disturbance, worry, anxiety, appetite changes,

weight increase, and difficulty focusing.  R. 1048.  A mental status checklist

indicated that Dyas had questionable insight and judgment, intact memory,

appropriate mood and affect, unremarkable psychomotor behavior,

appropriate eye contact, labored gait/posture, sad facial expression, goal

directed/logical train of thought, and no hallucinations or delusions.

Bayless indicated that Dyas showed improvement.  R. 1055.

On January 9, 2018, Dyas saw Dr. Nichole Mirocha, D.O., for

osteopathic manipulation therapy.  She reported daily pain, fatigue, and

depression.  Dyas reported that she worked as a photographer and could
not lift her equipment.  On examination, she moaned when she
repositioned herself on the exam table and made guarded antalgic
movements.  Dyas was tender at T-5.  She had normal judgment and
insight.  She was cooperative and had normal attention span and
concentration.  Her remote and recent memory was intact.  She was
anxious and tearful.  R. 1008.

On the same day, January 9, 2018, Dyas saw Advanced Practice
Nurse Peters.  She saw Peters after the osteopathic manipulation therapy.
Peters noted that Dyas was "in a lot of pain that was felt disproportionate to
the examination."  Dyas said she got a little relief from the osteopathic
manipulation therapy.  She took naproxen when her pain was not severe.
She switched to ibuprofen if the pain was bad.  Dyas was also tearful.  Her
mental health counselor suggested changing her medication Celexa.  She
did not want to change medications as she was doing better since she
started her current dose of Celexa.  R. 1003-04.  On examination, Dyas
was in no acute distress, had a normal gait and station, and had a normal
mood and affect.  R. 1005-06.  Peters continued all of Dyas' medications.
R. 1003.

On March 28, 2018, Dyas saw Dr. Thomas.  She rated her low back pain at 8/10 and reported she had left leg and foot numbness the day before.  She was working 20 hours a week as a photographer and continued to take naproxen and ibuprofen for her back pain.  She felt that the Celexa helped somewhat with her depression and anxiety.  She took Vistaril once or twice a day.  She said that she "will 'breakdown' but is less severe and she is less tearful."  R. 1000.  On examination, Dyas weighed 180.3 pounds and had a BMI of 32.71.  She was in no acute distress.  She was tender at her L-S spine.  Straight leg raising tests were negative.  Dr. Thomas recommended improving her diet and increasing her activity to reduce her weight.  She declined Dr. Thomas' offer to refer her to a pain center for epidural injections.  R. 1000.

On April 19, 2018, Dyas saw Dr. Thomas.  She was seeking Social Security disability.  She reported low back pain that radiated down her legs and said she could only work 4-5 hours a day, and she had to change positions to get comfortable.  She could only sit 60 percent of the time and used a footrest at work when seated to help with her symptoms.  Her anxiety had increased since her mother had a "significant stroke" and her boyfriend was diagnosed with cirrhosis.  R. 997.  On examination, Dyas had a normal gait and station. She was tender in the thoracic and L-S

spine, as well as in the paraspinal muscles.  She had limited flexion of the

spine and limit lateral bending.  Straight leg raising testing was negative.

She had normal muscle strength and tone, and a palpable spasm in her

trapezius muscles.  Her reflexes were 2+ and symmetric and she had no

sensory loss.  Her mood and affect were anxious and tearful.  R. 999.  Dr.

Thomas continued Dyas' current treatment.  R. 997.

On the same day, April 19, 2018, Dr. Thomas completed a Spinal

Impairment Questionnaire form.  R. 990-96.  Dr. Thomas listed Dyas'

diagnosis as lumbosacral facet arthropathy, degeneration of intervertebral

disc of cervical region, trapezius spasm, chronic neck pain, and lumbar

pain.  She stated Dyas' prognosis was fair and noted that her condition

"has persisted for 2 years since motor vehicle accident."  R. 990.  Dr.

Thomas stated that her diagnosis was supported by clinical findings of

limited lateral bending, limited flexion, tenderness at the base of the

cervical spine and lumbosacral spine, muscle spasms in the bilateral

trapezius muscles and lumbosacral paraspinal muscles, crepitus in the left

knee, trigger points post cervical along the trapezius, and an inability to

perform heel walking.  R. 990-91.  Dr. Thomas stated that Dyas had no

sensory loss, normal reflexes, no muscle atrophy, and no muscle

weakness.  R. 991.  She also based her diagnosis on the September 18,

2017 MRI of the cervical spine and the August 18, 2016 MRI of the lumbar spine.  Dr. Thomas stated that Dyas' primary symptoms were pain in her neck, midline back, and lower back, and numbness in her feet.  R. 992. Her symptoms were consistent with Dr. Thomas' diagnosis.  The pain was constant and had not been completely relieved by medication.  R. 993.

Dr. Thomas opined that, based on Dyas' impairments, Dyas would have the following limitations on her ability to work in a normal competitive five-day-a-week work environment on a sustained basis:  Dyas could sit for four hours a day, she could stand/walk for up to an hour a day; she would need to get up and move around for 10 minutes every one to one and on half hours; she could occasionally lift 10 to 20 pounds; and she could engage in "no pushing," "no pulling," "no kneeling," "no bending," and "no stooping."  R. 993-94, 996.  Dr. Thomas opined that Dyas would need to take unscheduled 10-minute breaks twice in four to five hours of work. Dyas' impairments limited her ability to hold her head in a constant position, and she could not perform competitive work that required her to do so on a sustained basis.  Dyas' pain symptoms would frequently interfere with her attention and concentration.  Her depression, anxiety, and panic attacks contributed to her symptoms and functional limitations.  She opined that Dyas could deal with moderate stress.  Dyas would be absent from work

more than three days a month due to her impairments or treatment. R. 994-95.  Dr. Thomas concluded, "Pt has developed depression with anxiety and panic attacks as a result of her condition and inability to maintain gainful employment."  R. 996.

<u>The Administrative Hearing</u>

On September 13, 2018, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 33-64.  Dyas appeared in person and with her attorney.  Vocational expert Dewey Franklin appeared by telephone.  R. 35.

Dyas testified first.  She graduated high school and had vocational training in photography.  After the Onset Date she worked for the photography studio she used to work for as a photographer for about 20 hours per week helping with paperwork in the office.  She last worked for the photography studio in April 2018. R. 44, 46-47.

Dyas was divorced and lived with her 16-year-old daughter in a one-story home with a basement.  The washer and dryer were in the basement. Dyas drove two to four times a week, depending on the number of appointments she had.  R. 46-47.  Her boyfriend drove her to the hearing because driving was painful.  Turning the steering wheel caused back spasms.  R. 54.

Dyas said she could not work because of her pain:

I am in constant pain 24/7. It doesn't go away. I have recently
developed a pain in my right leg to where from my knee down
to my ankle it is on fire. My left ankle feels like there is a spider
on it constantly. Bending, moving, twisting, any of that, constant
pain. Sitting, constant pain. It is very debilitating. It has brought
on some depression as well.

R. 48.  Dyas said her pain was normally 5/10 or 6/10 and activity made the

pain worse and lying down in a particular position.  She took a muscle

relaxant and ibuprofen for pain.  None of her medications worked for her

pain.  R. 53.  She saw a surgeon the week before the hearing.  He was

going to order another MRI of her back.  R. 49.

Dyas also testified about her mental impairments.  She had never

gone to an emergency room or been admitted to a hospital due to her

mental impairments, but had gone to a mental health therapist.  She

stopped seeing the therapist in December 2017.  Dyas explained, "This

woman just kept talking about her daughter and I just didn't feel like I

needed to be there to listen to that.  I was there for my problems."  Dyas

has not found another mental health professional to see for counseling.  R.

51.  Her primary care physician Dr. Thomas prescribed Dyas' medications

for her mental health impairments.  R. 51.

Dyas testified that she had four to five panic attacks per month and

the attacks lasted from a few minutes to four or five hours.  R. 54-55.

The ALJ asked about the medical notes that indicated that Dyas drank half a gallon of alcohol once or twice a week and smoked marijuana. Dyas said she drank that much in the past, and she smoked marijuana, due to her depression and her pain.  She last drank alcohol two weeks before the hearing.  She still smoked marijuana twice a week before bed.  She did not have a prescription for medical marijuana.  R. 52.

Dyas' daughter did all the manual household chores and Dyas handled the finances and paid the bills.  R. 52.  She did not do chores due to her pain.  R. 53.  She went grocery shopping about once a week. Shopping trips took 45 minutes and she leaned on the grocery cart as she walked around the store.  Her daughter went with her and bagged and carried the groceries.  R. 55.

Dyas opined that the heaviest weight she could lift was five pounds. She could stand for an hour if she could walk around.  She could not stand in one place for long due to the pain.  She could walk about half a mile before she had to sit down.  R. 57.

Dyas went to church every week.  Services lasted an hour and she changed positions during services:

> They are about an hour long. I tis (sic) hard to kneel. I don't
> kneel. I kneel but then I put my butt on the pew. We do a lot of
> kneeling, sitting and standing.  So when I am standing I do
> have to adjust myself throughout.

R. 57.

Vocational expert Franklin then testified.  The ALJ asked him the

following hypothetical question:

> For the first hypothetical I would like you to assume a
> hypothetical individual of the claimant's age, education and with
> those past jobs that we just discussed. Further assume this
> individual can perform work at the light exertional level, can
> occasionally climb ladders, ropes, scaffolds or stoop with work
> that can be learned in 30 days or less with simple, routine
> tasks, able to work I am sorry. Able to remain on task for two
> hour increments with occasional interaction with supervisors
> and the general public. Could such a hypothetical individual
> perform any of the claimant's past work?

R. 59-60.  Franklin opined that such a person could not perform Dyas' past

relevant work.  R. 60.

Franklin opined that such a person could perform other jobs that

existed in the national economy, including assembly press operator, with

over 200,000 such jobs in the national economy; small products assembler

with over 200,000 such jobs in the national economy; and parts inspector,

with 130,000 such jobs in the national economy.  R. 60.  He stated the

person could perform all of these jobs even if the person had the additional

limitation of no climbing of ropes, scaffolds, or ladders.  R. 60-61.

Franklin said the person could not work if she also needed to change

positions every 30 minutes while remaining on task.  R. 61.  Franklin

opined that a person could not be absent from work for a probationary period of 30 to 90 days.  After that, the person could have one or two absences, but an employer would not tolerate a pattern of chronic absences.  R. 62.  The hearing then concluded.

<u>THE DECISION OF THE ALJ</u>

On December 27, 2018, the ALJ issued her decision.  R. 13-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Dyas met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since her Onset Date and she had severe impairments of degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, obesity, depression, and poly-substance abuse.  The ALJ found that Dyas' part time work for the photography studio after the Onset date was not enough to constitute

3:19-cv-03287-TSH   # 21   Page 34 of 45

substantial gainful activity.  R. 16.[4]  At Step 3, the ALJ found that Dyas'

impairments or combination of impairments did not meet or equal a Listing.

R. 16-17.

Before addressing Step 4, the ALJ found that Dyas had the following

RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except she can never climb ladders, ropes or
> scaffolds. With work that can be learned in 30 days or less, with
> simple routine tasks, she is able to remain on task for two-hour
> increments; and occasional interaction with supervisors and the
> general public.

R. 17-18.  The ALJ relied on the finding of chiropractor Kennedy that Dyas'

condition improved after each chiropractic treatment after the Onset Date.[5]

The ALJ found that functional limitations due to the impairments shown in

Dyas' two MRIs were appropriately addressed by RFC's limitation to light

work with no climbing of ropes, ladders, and scaffolds.  The ALJ also relied

on numerous medical examinations of Dyas that the ALJ found to be

unremarkable.  These examinations consistently found normal strength,

sensation, muscles, gait, and station.  The ALJ noted that Dr. Thomas

---

[4] The ALJ found that Dyas' anxiety was not a severe impairment.  R. 16.  Dyas does not challenge this finding.
[5] The ALJ gave no weight to Dr. Kennedy's opinion in his August 3, and 29, 2016 examination reports.  R. 23.  Dyas does not challenge this finding.

Page **34** of **45**

released Dyas in February and March 2017 to work two days a week and to lift up to 20 pounds.  The ALJ relied on the fact that Dyas only took NSAIDs, such as naproxen and ibuprofen, and muscle relaxants to treat her pain.  She did not use stronger pain-relieving medication.  The ALJ noted that Dyas did not go to the emergency room for pain after July 2016.  The ALJ relied on Dr. Trello's mental status examination that showed relevant and coherent stream of conversation and intact memory and goal directed and logical thought processes.  The ALJ also relied on the fact that Dyas stopped her mental health counseling in December 2017 and thereafter did not find a new counselor and did not experience any mental health crises that required her to go to the emergency room.  R. 18-21.  The ALJ also relied on the opinions of Drs. Aquino and Dow, and psychologists Drs. DiFonso and Hudspeth.  R. 23.

The ALJ gave no weight to Dr. Thomas' April 19, 2018 opinions.  The ALJ found that Dr. Thomas' opinion that Dyas could occasionally lift 20 pounds and occasionally carry 10 pounds was inconsistent with her opinions that Dyas could not push, pull, kneel, bend, or stoop, and her opinion that Dyas would need unscheduled breaks twice in four to five hours.  The ALJ stated that Dr. Thomas' examination notes did not support her opinions that Dyas could not heel walk, had numbness in her feet,

neck, and back, and would be absent more than three times a month.  The ALJ discounted Dr. Thomas' opinion on functional limitations due to her mental impairments because Dr. Thomas did not have a specialty in mental illness.  The ALJ also found that Dr. Trello's findings were inconsistent with Dyas' claimed functional limitations.  R. 23-24.  The ALJ concluded, "Neither the doctor's own reports, nor the medical records as a whole supports the foregoing opinions, and it is given no weight."  R. 24.

The ALJ gave little weight to Dyas' statements regarding her symptoms.  The ALJ found them to be inconsistent with the medical and chiropractic evidence that supported the RFC finding.  The ALJ also found the testimony inconsistent with the fact that Dyas only took NSAIDS and muscle relaxants for her pain, she voluntarily stopped seeing her mental health therapist and did not seek additional specialized mental health care, she did not seek emergency room care for her depression, and she was not hospitalized for her depression.  The ALJ also found that her descriptions of her symptoms were inconsistent with her daily activities.  The ALJ noted that Dyas cooked meals and washed dishes, drove, went out alone, and shopped.  The ALJ noted that Dyas worked part time through April 2018.  The ALJ also noted that Dyas regularly went out to eat and to church, and she had no difficulty with authority figures.  R. 18-23.

Upon determining Dyas' RFC, the ALJ found at Step 4 that Dyas could not perform her prior relevant work.  R. 24.  At Step 5, the ALJ found that Dyas could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Franklin that a person with Dyas' age, education, work experience, and RFC could perform the representative jobs of assembly press operator, small product assembler, and parts inspector.  The ALJ concluded that Dyas was not disabled.  R. 25.

Dyas appealed the ALJ's decision.  On October 10, 2019, the Appeals Council denied her request for review.  The ALJ's decision then became the final decision of the Defendant Commissioner.  R. 1.  Dyas then filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Substantial evidence in the record supported the ALJ's RFC finding. Several of Dyas' medical examinations contained significant normal findings.  See R. 518-19 (June 29, 2016, normal gait and station; normal muscle, joints, and bones; and normal range of motion in her back with discomfort); R. 459 (July 21, 2016, normal range of motion in her spine and extremities; normal strength and sensation in her lower extremities; no weakness in her gait; tenderness in her spine but otherwise normal

strength and tone); R. 514 (September 21, 2016, normal gait and station; normal muscles, bones, and joints; decreased range of motion in her back; and no sensory loss); R. 1037 (December 15, 2016, normal range of motion, normal muscle strength and tone); R. 1028, 1030 (February 22, 2017, normal gait and station; tender back and painful straight leg raising; and permission to work 10 hours a week and lift up to 20 pounds); R. 997 (April 19, 2018, normal gait and station; negative straight leg raising test; normal muscle strength and tone; tender in her spine with limited flexion of the spine; and spasm in trapezius muscles).  Dr. Thomas found a positive straight leg raising test on January 24, 2017 and a painful straight leg raising test on February 22, 2018, but negative straight leg tests on March 29, 2017, June 6, 2017, September 6, 2017, March 28, 2018, and April 19, 2018.  R. 1031, 1028, 1027, 1019, 1016, 1000, 997.  The chiropractor Dr. Kennedy found that Dyas had made "definite functional objective gains" and was better after her course of treatment with him.  R. 938.  In addition, Dyas generally used just NSAIDs and muscle relaxants to treat her pain rather than stronger pain medication. Drs. Aquino and Dow's opinions largely agreed with the physical limitations in the RFC.  All this evidence supported the physical functional aspects of RFC.  The limited imaging in the record generally showed mild to moderate impairments that were

stable.  See R.1019 (June 2017 x-ray showed stable degenerative changes when compared to prior imaging dating back to 2015).  The August 18, 2016 MRI noted moderate to severe left neural foraminal stenosis at L5-S1. The ALJ considered the imaging findings, including the August 18, 2016 MRI, and determined that the restriction to a limited rage of light work addressed those findings.  All of this evidence constitutes substantial evidence that supported the physical aspects of the ALJ's RFC finding.

Substantial evidence also supported the functional limitations in the RFC due to Dyas' mental limitations from her depression.  Dyas had no episodes of mental impairments severe enough to result in emergency room visits or hospitalizations; this was true even after she stopped seeing her mental health counselor.  Her primary care physician prescribed all her mental health medications.  Dyas was able to relate to others even with her depression.  She went to church every week.  She went out to eat regularly.  She spent time with family and friends.  She was consistently cooperative with her healthcare providers.  Dr. Trello found that she had logical goal-oriented speech and intact memory.  Several healthcare professionals also found that her memory was intact and a normal mood and affect.  She became angry at a medical visit only once when she terminated the examination because the doctor would not immediately

order an MRI on her demand.  R. 505, 507.  Dyas also reported in the two

Function Reports that she could follow instructions and get along with

authority figures.  She also said that she could pay attention for up to two

hours.  R. 262, 310.  All this evidence provided substantial evidence to

support the ALJ's findings in the RFC that Dyas was limited to work that

can be learned in 30 days or less and with simple routine tasks, and the

additional limitation that Dyas could only concentrate for two hours at a

time.

Dyas argues that the ALJ erred by not giving Dr. Thomas' April 19,

2018 opinions controlling authority.[6]  The ALJ must give the opinions of a

treating physician controlling weight if the opinions are supported by

objective evidence and are not inconsistent with other evidence in the

record.  20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608

(7th Cir. 2008).[7]  The ALJ found that Dr. Thomas' opinions were not

consistent with the rest of the medical evidence in the record.  The

examinations noted above that found significant normal findings supported

---

[6] Dr. Thomas also imposed some work restrictions on Dyas at the February 22, 2017 examination.  The ALJ gave these opinions no weight.  R. 23.  Dyas does not raise any issues related to the ALJ's assessment of these opinions.  These opinions also appear to the Court to be temporary work restrictions and not opinions of her long-term functional limitations.

[7] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

the ALJ's determination on this point.  The ALJ also found that Dr. Thomas'

opinions were internally inconsistent because Dr. Thomas said she could

occasionally lift 20 pounds and occasionally carry 10 pounds but could not

push, pull, kneel, bend, or stoop.  Dyas argues that Dr. Thomas did not

mean that she could never engage in these postural activities.  See

Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion for

Summary Judgment (d/e 20), at 4.  Dr. Thomas checked options on the

form, "no pushing", "no pulling", no kneeling", "no bending", and "no

stooping."  R. 996.  Dr. Thomas' endorsement of these unqualified

declarative statements provided substantial evidence to support the ALJ's

conclusion that Dr. Thomas opined that Dyas could never engage in any of

these postural activities.  The Court further finds that the ALJ could

reasonably find that these opinions about postural limitations were

inconsistent with Dr. Thomas' lifting and carrying opinions.  The ALJ also

was correct that the record did not support Dr. Thomas' finding that Dyas

had a knee problem.  Dr. Thomas' opinions were also inconsistent with the

opinions of Drs. Aquino and Dow.  The ALJ was also correct that Dr.

Thomas was not a specialist in mental disorders, and she did not define the

term that she used, "moderate stress."   Taken together, this evidence

provided substantial evidence to support the ALJ's conclusion to not give

weight to Dr. Thomas' opinions because they were not consistent with the

medical evidence and other evidence in the record.

Dyas also argues that the ALJ erred in the weight given to Dyas'

statements about the severity of her symptoms.  The Court again

disagrees.  Dyas stated that she was in constant pain that severely limited

her ability to do anything.  At the hearing, for example, she testified:

> I am in constant pain 24/7. It doesn't go away. I have recently
> developed a pain in my right leg to where from my knee down
> to my ankle it is on fire. My left ankle feels like there is a spider
> on it constantly. Bending, moving, twisting, any of that, constant
> pain. Sitting, constant pain. It is very debilitating.

R. 48.  She made similar statements in her Function Reports.  See R. 257

(2016 Function Report, "The amount of pain I'm in daily is very debilitating .

. .  It doesn't go away . . .  I have sharp pains in my head throughout the

day and sick to my stomach 20-30 times a day."); R. 305 (2017 Function

report, "I'm in constant pain from the time I wake till I go to sleep. . . .").

The ALJ pointed to evidence that was inconsistent with Dyas' statements.

In particular, the ALJ noted that Dyas prepared meals, drove, went to

church weekly for an hour, went out to eat regularly, and worked 20 hours a

week.  R. 20, 22.   The ALJ reasonably found that these activities are

inconsistent with Dyas' statements about the severity of her symptoms.

The ALJ also pointed to the several medical examinations that showed

largely normal results and the imaging that largely showed stable, moderate impairments.  This evidence provided substantial evidence for the ALJ's finding that Dyas' statements about her symptoms were not consistent with the other evidence in the record.

Dyas argues that the ALJ improperly treated her daily activities as evidence that she could engage in substantial gainful activities.  The Court disagrees.  Rather, the ALJ noted inconsistencies between her statements and her activities to determine weight to give to Dyas' statements.  The ALJ may properly discount the claimant's statements about the severity of her symptoms when those statements are inconsistent with the other evidence in the record, " [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . ."  SSR16-3p, 2017 WL 5180304, at *8.  The ALJ did not err in her evaluation of Dyas' statements.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED; Plaintiff Rachelle Dyas' Motion for Summary Judgment (d/e 14) is DENIED; and the decision

of the Defendant Commissioner is AFFIRMED.  All pending motions are

denied as moot.  THIS CASE IS CLOSED.

ENTER:   February 24, 2021

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE